[No. B046856. Second Dist., Div. One. June 19, 1991.]

UNITED COMMUNITY CHURCH, Plaintiff and Respondent, v.
ROBERT W. GARCIN et al., Defendants and Appellants.

328

**COUNSEL**

Charlston, Revich & Williams, Murchison & Cumming, Horvitz & Levy, George P. Schiavelli and Douglas G. Benedon for Defendants and Appellants.

Scolinos, Slater & Bernal, Leonard Sacks and Marian H. Tully for Plaintiff and Respondent.

**OPINION**

**VOGEL, J.**—Properly conceived and executed, motions for summary adjudication of issues encourage settlement, reduce trial time, save money for the

parties and preserve limited judicial resources. Ill-conceived and improperly executed motions for summary adjudication have just the opposite effect— they waste time and money and, almost as certainly as night follows day, result in reversals and further litigation. This case presents a paradigm of the latter form of motion and we therefore reverse a judgment predicated on an earlier order adjudicating three issues in a legal malpractice action, finding that the issue of causation was neither summarily adjudicated nor proved at the subsequent trial.

## FACTS

Promising construction of a theological library, William S. McBirnie, the senior minister of United Community Church (UCC), borrowed money from two dozen individuals and signed promissory notes in his capacity as President of the Community Churches of America (CCA). He used the money for other purposes and refused to repay the loans.

Not surprisingly, the two dozen lenders sued McBirnie, CCA, UCC and several other entities for damages, an accounting, and imposition of a constructive trust, claiming McBirnie had diverted the borrowed funds to UCC and that UCC was CCA's alter ego, formed expressly to protect McBirnie and CCA from liability on these loans. (Kendall v. Community Churches of America (Super. Ct. L.A. County, 1984, No. NCC 14282G).)

Robert W. Garcin, a partner in the law firm of Irsfeld, Irsfeld & Younger (collectively Garcin), communicated to Christ Troupis, counsel for the Kendall plaintiffs, that he was authorized to accept service on behalf of all of the Kendall defendants, including UCC. Copies of the summons and complaint were duly delivered to Garcin and Garcin, in turn, acknowledged receipt on behalf of UCC and the other defendants.

Garcin failed to respond to the Kendall complaint on behalf of any of the defendants and, at Troupis's request, defaults were entered. A prove-up hearing was held, at which Troupis submitted evidence to prove, among other things, that UCC was the alter ego of McBirnie and CCA. The trial court entered judgment in favor of the Kendall plaintiffs and against all defendants in the amount of $1,234,045. The Kendall defendants' subsequent motion to vacate the default judgment was denied, and their appeal from the judgment (based solely on the validity of service on Garcin) was unsuccessful. (Kendall v. McBirnie (Jan. 5, 1987) B015508 [nonpub. opn.].)

Predictably, UCC sued Garcin for damages for legal malpractice, alleging that Garcin was negligent in failing to file an answer or other responsive pleading in the Kendall action. Garcin answered, generally denying the

allegations and raising affirmative defenses of comparative fault and failure to mitigate damages.

UCC moved for summary judgment or, in the alternative, summary adjudication of three issues. In the second part of the motion, UCC asked the trial court to adjudicate (1) that "the summons and complaint in the [Kendall action were] properly served upon [UCC] by service upon [Garcin], acting as its attorneys in that action;" (2) that Garcin's action "in not filing an [a]nswer or other responsive pleading to the *Kendall* [c]omplaint . . . breached [Garcin's] duty of care to [UCC], and was thereby negligent and below the standard of care;" and (3) that "as a proximate result of the actions of [Garcin] in not timely responding to the complaint in the *Kendall* action, default *judgment* in the amount of $1,234,045.00 was entered against [UCC]." (Italics added.)

In its accompanying separate statement of undisputed facts, UCC listed 12 facts to establish that UCC was sued in the Kendall action, that (with authority to do so) Garcin agreed to and did accept service on behalf of UCC, that such service was proper, that Garcin nevertheless failed to respond to the Kendall complaint, that default was thereafter requested and entered and a judgment rendered in the amount of $1,234,045 and, finally, that because Garcin failed to respond within 30 days, UCC "lost the case and its money and property was ordered to be taken without further warning from the court."

Garcin opposed the motion, submitting substantial evidence and argument to show that even if an answer had been filed for UCC, it nevertheless would have suffered the same judgment because it had no legitimate defense to the Kendall action. Among other things, Garcin offered evidence to show that UCC was in fact the alter ego of McBirnie and CCA as found by the trial court at the default prove-up hearing in the Kendall action.

In its reply, UCC for the first time suggested that it was not the alter ego of McBirnie or CCA. In neither its moving papers nor its reply did UCC address either of Garcin's affirmative defenses nor did it prove or even argue that, but for Garcin's failure to respond to the Kendall complaint, it had a meritorious defense that would have resulted in a judgment against the Kendall plaintiffs and in favor of UCC.

The trial court denied the motion for summary judgment but granted the motion for summary adjudication, adjudicating all three issues as requested by UCC. Thereafter, the trial court conducted a nonjury trial on the issue of damages. Although Garcin attempted to present evidence and argue causation—that the judgment would have been entered against UCC even if an

answer had been filed on its behalf—the trial court expressly and unequivocally precluded the offered evidence and argument, and entered judgment in favor of UCC in the amount of $2,106,146.68. Garcin's motion for a new trial was denied and this appeal followed.

## DISCUSSION

Garcin contends the judgment must be reversed because the motion for summary adjudication of issues was fatally defective and should have been denied. He asserts that UCC failed to demonstrate that, as a matter of law, it would have prevailed in the Kendall action had an answer been filed on its behalf. Alternatively, Garcin asserts that if the adjudicated issues are read narrowly to leave open the question of causation, the judgment must nevertheless be reversed because the trial court refused to hear evidence on that issue. Other issues are raised, but we do not reach them because we agree with Garcin that there is no proof of causation.

## A.

## THE STATUTE

At the time of UCC's motion, former section 437c of the Code of Civil Procedure provided, in subdivision (f), that a party could move for summary adjudication of issues (SAI), either by itself or as an alternative to summary judgment.[1] Then and now, subdivision (b) requires that a motion for SAI be supported by "a separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed. Each of the material facts stated shall be followed by a reference to the supporting evidence. The failure to comply with this requirement of a separate statement may in the court's discretion constitute a sufficient ground for denial of the motion. [¶] . . . The opposition papers shall include a separate statement which responds to each of the material facts contended by the moving party to be undisputed, indicating whether the opposing party agrees or disagrees that those facts are undisputed. The statement also shall set forth plainly and concisely any other material facts which the opposing party contends are disputed. . . ."[2]

---

[1] Subdivision (f) of section 437c was amended in 1990 (Stats. 1990, ch. 1561, § 2) to limit a motion for SAI to attacks on one or more causes of action, affirmative defenses, claims for specified damages, and to the issue whether one or more defendants owed a duty to the plaintiff. (See also Stats. 1990, ch. 1561, § 1 ["It is . . . the intent of this legislation to stop the practice of adjudication of facts or adjudication of issues that do not completely dispose of a cause of action or a defense"]; and see Lewin & Vogel, *Summary Judgment's Abused Step-Child: Motions for Summary Adjudication of Issues* (Fall 1988) 2 Cal. Litigation 3.)

All section references are to the Code of Civil Procedure.

[2] Although it was understood, prior to the 1990 amendment, that the separate statement requirement applied to motions for SAI as well as motions for summary judgment (see

## B.

## The Pyramid Game

Outside the investment arena, "pyramid" is not a dirty word. As Judge John Zebrowski of the Los Angeles Superior Court has explained, visualization of a motion for SAI as a pyramid directs both the drafter's and the decisionmaker's attention to the proper analysis. (Zebrowski, *The Summary Adjudication Pyramid* (Nov. 1989) 12 L.A.Law. 28.) Construction starts at the top and proper design builds a structure subject to demolition only by opposition establishing a triable issue of material fact and not by a procedural glitch.

At the top is the *issue* the moving party wants adjudicated. To justify adjudication of the issue, the moving party must show that it is supported by undisputed facts, a showing made by way of the next step down the pyramid, the *separate statement* of undisputed facts. At the base of the pyramid is admissible *evidence* supporting the facts listed in the separate statement. Upon descending to the base of the pyramid, the moving party shifts the burden to the opponent who must then, by use of a responsive separate statement and admissible evidence, establish that there are triable issues of material fact. (Zebrowski, *The Summary Adjudication Pyramid, supra*, 12 L.A. Law. at pp. 29-30.)

## C.

## The Issues

As this case demonstrates, the manner in which an issue is framed is critical. ▪ To begin with, an issue should be phrased in language appropriate for adoption by the court if the motion is granted. (See, e.g., Super. Ct., L.A. County, Law and Discovery Policy Manual, 209(a).)[3] If nothing else, this avoids debate about whether the language of the order properly reflects the issue actually adjudicated.

More importantly, the issue should be clear and unambiguous and its scope should be apparent. In this regard, UCC's first two issues are reasonably clear—that summons and complaint were properly served on UCC by

*Haskell* v. *Carli* (1987) 195 Cal.App.3d 124, 130 [240 Cal.Rptr. 439] ["motions for summary adjudication are governed by the language of subdivisions (b) and (c)"]), subdivision (f) of section 437c now expressly requires that an SAI motion "shall proceed in all procedural respects as a motion for summary judgment . . . ." In the case at bench, both parties filed separate statements.

 [3]References to LDPM are to the Law and Discovery Policy Manual of the Los Angeles County Superior Court.

service on Garcin, acting as UCC's attorney, and that Garcin's failure to file a responsive pleading was a breach of his duty of care to his client, a negligent act below the standard of care in the community.

■ The third issue—that as a proximate result of Garcin's actions "in not timely responding to the complaint in the Kendall action," default judgment was entered against UCC—creates the problem. At best, the statement is ambiguous and the problem is that it was construed by UCC and the trial court to include a complete adjudication of the issue of causation.[4] In other words, instead of reading it narrowly to mean merely that the failure to respond resulted in the *entry of default,* the trial court read it broadly (indeed, with great generosity) to mean that the failure to respond resulted in the entry of default which, in turn, resulted in a *default judgment* incorporating an implied finding that, had an answer been filed, the Kendall plaintiffs would necessarily have prevailed on the merits because UCC had no defense to the action.

■ Proof of legal malpractice requires proof not only of negligence by the lawyer but also of causation, a trial within a trial to establish that, but for the lawyer's negligence, the client would have prevailed in the underlying action. Although Garcin concedes he was negligent in failing to respond, that concession is merely the first step in determining whether Garcin will ultimately be liable to UCC. UCC can recover from Garcin only upon proof that, but for his negligence, UCC would not have had an adverse judgment rendered against it in the Kendall action because it had a valid defense to the claims asserted against it. (*Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 153 [65 Cal.Rptr. 406, 28 A.L.R.3d 368] [the question is one of what would have happened if the lawyer had acted otherwise].)

■ The question about what would have happened had Garcin acted otherwise is one of fact unless reasonable minds could not differ as to the legal effect of the evidence presented. (258 Cal.App.2d 136, 153.) Arguably, reasonable minds could not differ about the direct effect of Garcin's failure to respond to the complaint—default was entered. But by no stretch of the imagination can it be said, based on the straight language of the issue framed by UCC, that all reasonable minds would agree that, had an answer been filed, the Kendall plaintiffs could not have prevailed against UCC.[5] For this reason, we must turn to UCC's separate statement of undisputed facts.

---

[4]To be more precise, the trial court acted under a mistaken belief that UCC did not have to prove causation and that Garcin was not entitled to prove that UCC would have lost the Kendall action even if an answer had been filed. As we explain below, the trial court was wrong.

[5]Although the 1990 amendment to subdivision (f) of section 437c, which if applied to this motion would require the issue to address the entire cause of action for legal malpractice,

# D.

## SEPARATE STATEMENTS

■ Separate statements are required not to satisfy a sadistic urge to torment lawyers, but rather to afford due process to opposing parties and to permit trial courts to expeditiously review complex motions for SAI and summary judgment to determine quickly and efficiently whether material facts are disputed.

Although section 437c gives the trial court discretion to grant or deny summary judgment or SAI based upon a failure to file a separate statement (§ 437c, subd. (b); *Gilbertson v. Osman* (1986) 185 Cal.App.3d 308, 315-316 [229 Cal.Rptr. 627]), the prevailing view is that it is only in the truly exceptional case involving a single, simple issue with minimal evidentiary support that a court will consider the merits of a motion unaccompanied by a separate statement. (*Blackman v. Burrows* (1987) 193 Cal.App.3d 889, 893-894 [238 Cal.Rptr. 642].) The failure to file a responsive separate statement usually results in a continuance of the motion to permit the filing of proper papers and an award of fees and costs as a condition of the continuance for purposes of complying with the statute. (§ 437c, subd. (b); LDPM, par. 207.)

As the court explained in *Blackman v. Burrows, supra,* 193 Cal.App.3d at pages 894-895, it is no answer to say the facts set out in the supporting evidence or memoranda of points and authorities are sufficient. "Such an argument does not aid the trial court at all since it then has to cull through often discursive argument to determine what is admitted, what is contested, and where the evidence on each side of the issue is located. . . . [¶] A properly prepared separate statement, in contrast, can materially ease the trial court's burden. While it is not required [by the statute], it is preferable that the statement be in a separately bound or filed document not physically attached to the memorandum of points and authorities. . . .[6] Thus, the moving party should present papers labeled, 'Separate Statement of Undisputed Facts.' That statement should list in numbered paragraphs without argumentation each material fact necessary to entitle the moving party to summary judgment. And, as required by subdivision (b) [of section 437c],

---

might make framing the issue easier, it does not change the separate statement requirements or the burden of proof issues discussed below.

[6]See LDPM, ¶ 207, which requires the filing of a separate document so that it can be compared, side by side, with the responding separate statement. (See also *Shadle v. City of Corona* (1979) 96 Cal.App.3d 173, 177 [157 Cal.Rptr. 624] ["Local court rules and policies have the force of procedural statutes, so long as they are not contrary to legislative enactments"].)

immediately following each fact so stated there should be a reference to the supporting evidence . . . ."[7]

"A party opposing [the] motion must file a similar separate statement labeled as such. . . . [T]he opposing separate statement should list, and preferably quote each of the facts set forth in the moving papers. If the opposing party admits any of the statements set forth in the moving separate statement, the admission should be clearly listed. . . . [¶] And, just as is the case with the moving party's separate statement, the opposing party is required by the statute, in connection with each fact which the opposing party disputes, to follow the statement of that fact by reference to the evidence which creates the dispute."[8] (*Blackman* v. *Burrows*, *supra*, 193 Cal.App.3d at pp. 895-896.)

---

[7]See LDPM, ¶ 207, for the format required in Los Angeles:

Moving Party's Statement
of Undisputed Facts

| Undisputed Facts | Evidentiary Support |
| --- | --- |
| 1. On January 2, 1985, Smith telephoned Jones and stated as follows: "Are you interested in buying my shopping center?" | Smith Depo., pp. 12-13, lines 4-18 (Exhibit A); Jones Declaration, 4, p. 3 (Exhibit B). |
| 2. Jones responded, "Maybe. What's your asking price?" | Smith Depo., pp. 13-14, lines 12-20 (Exhibit A); |

It is not a coincidence that the facts stated in the LDPM's example are evidentiary in nature rather than conclusory. Evidentiary facts are required by subdivision (b) of section 437c and by commonsense consideration of the fact that summary judgment and SAI are substitutes for an actual trial or part thereof, thus requiring the same type of evidence required at a trial.

[8]LDPM, ¶ 207, requires the opposing separate statement to quote each of the moving party's claimed undisputed facts in the following format:

Responding Party's
Statement of Disputed and Undisputed Facts

| Facts | Evidentiary Support |
| --- | --- |
| 1. On January 2, 1985, Smith telephoned Jones and stated as follows: "Are you interested in buying my shopping center?" | Undisputed. |
| 2. Jones responded, "Maybe. What's your asking price?" | Disputed. Smith Depo., pp. 14-16, lines 10-20 (Exhibit M); Smith Declaration, 7 p. 4, (Exhibit Q). |

The due process aspect of the separate statement requirement is self-evident—to inform the opposing party of the evidence to be disputed to defeat the motion. This is because the trial court is required to determine whether the facts presented, standing alone and if true, legally require a favorable ruling on the legal issue presented. (Zebrowski, *The Summary Adjudication Pyramid, supra,* 12 L.A. Law. at p. 29.) As Judge Zebrowski explains, *all* material facts must be set forth in the separate statement. "This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate statement, *it does not exist.* Both the court and the opposing party are entitled to have all the facts upon which the moving party bases its motion plainly set forth *in the separate statement.*" (*Ibid.,* italics in original; see also *Department of General Services v. Superior Court* (1978) 85 Cal.App.3d 273, 284 [147 Cal.Rptr. 422] ["because of the drastic nature of the remedy" of summary judgment and SAI, the moving party "is held to strict compliance with the procedural requisites"].)

 UCC's separate statement falls far short of the mark. The closest fact to the causation issue is fact No. 12: "That because within 30 calendar days after the summons in [the Kendall action] was served on [Garcin, he] did not file a typewritten response at the court, [UCC] lost the case and its money and property was ordered to be taken without further warning from the court." Aside from the fact that this is a mere conclusion and not an evidentiary fact (§ 437c, subd. (b)), it omits any reference to the merits of the underlying case and does not address causation. The purported "proof" for this "fact" similarly fails to explain what would have happened if Garcin had filed an answer in the Kendall action.[9]

To belabor the obvious, there isn't a word about what defense, if any, UCC would have presented had Garcin filed a timely response, nor is there anything to suggest a defect in the Kendall plaintiffs' case that would have precluded a judgment against UCC had it appeared and defended the action. We therefore do not discuss the base of the pyramid, the sufficiency of the evidence offered to support the facts presented in the separate statement. As

---

[9]Here is the "proof," in its entirety:

"The Court File in [the Kendall action], which contains no answer or other timely responsive pleading. The court is requested to take judicial notice of this file which is a part of its files and records.

"The Request to Enter Default in the Court File in [the Kendall action], filed August 16, 1984 with default entered on that date, a true and correct copy of which is appended hereto as Exhibit 3.

"The judgment signed in [the Kendall action] on May 13, 1985, under the signature of the Honorable Florence-Marie Cooper, a true and correct copy of which is appended hereto as Exhibit 7.

"The opinion of the Court of Appeal in [the Kendall action], a true and correct copy of which is appended hereto as Exhibit 2." (This was the appeal that upheld service on Garcin.)

Judge Zebrowski explains, if the facts presented in the moving party's separate statement, even if true, do not require or permit the desired ruling, the motion will be denied without further analysis. It is only if the facts stated, if true, require the desired ruling that the court examines the sufficiency of the evidentiary support and, if it is sufficient, looks to the opposing papers to determine whether there is a triable issue of material fact. (Zebrowski, *The Summary Adjudication Pyramid, supra*, 12 L.A. Law. at p. 30 ["SAI Flow Chart"].)

Accordingly, it is clear that UCC's SAI motion failed to resolve the issue of causation or anything else about the underlying Kendall action.

## E.

### THE BURDEN OF PROOF

In opposition to UCC's motion for SAI, Garcin wisely admitted the first eleven facts and limited the dispute to fact No. 12, in response to which he asserted that UCC was the alter ego of McBirnie and CCA and in support of which he offered evidence to prove his point. In his supporting memorandum, he explained that UCC had failed to prove that it had a valid defense to the Kendall action and argued that even if UCC had filed an answer, it would nevertheless have been found to be CCA's alter ego and suffered the same judgment entered on default.

Finally, in its reply, UCC addressed the alter ego issue by way of supplementary declarations. By this time, however, it was too late.

■ On a motion for summary judgment or SAI, the burden is *always* on the moving party to show there is no triable issue of material fact.[10] (*Vesely v. Sager* (1971) 5 Cal.3d 153, 169 [95 Cal.Rptr. 623, 486 P.2d 151].) When the moving party is the plaintiff, the burden is to prove every element necessary to establish its right to the relief it seeks and to disprove every affirmative defense asserted against it. Until this is done, the defendant has no burden to produce opposing evidence or to disprove anything at all. (*Hayward Union etc. School Dist.* v. *Madrid* (1965) 234 Cal.App.2d 100, 120 [44 Cal.Rptr. 268]; see also Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (1990) § 10:233, p. 10-52.) It is immaterial that at trial the burden to prove an affirmative defense or some other fact might be on the defendant. On a plaintiff's motion for summary judgment or SAI, the

---

[10]*Weiss* v. *Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094, 1098-1099 [251 Cal.Rptr. 727], cited in the concurring opinion, *post*, does not address the burden of proof issue.

burden is on the plaintiff, not the defendant. (*Hayward Union etc. School Dist.* v. *Madrid, supra,* 234 Cal.App.2d at p. 120.)

■ Accordingly, it is irrelevant that Garcin opposed UCC's motion by presenting evidence to show that UCC would have lost even if it had responded to the Kendall complaint. By failing to meet its initial burden, UCC should have lost the motion even in the absence of any opposition at all. (*Leyva* v. *Superior Court* (1985) 164 Cal.App.3d 462, 469, 475 [210 Cal.Rptr. 545].) The fact that Garcin chose to explain to the trial court that he did indeed have an arguable defense to the malpractice action is not a reason to impose upon him a burden he did not have. (*Hayward Union etc. School Dist.* v. *Madrid, supra,* 234 Cal.App.2d at p. 120.)

F.

### TRIAL OF THE REMAINING ISSUES

If the trial court had construed the issue narrowly, simply to eliminate from the actual trial the issue whether it was the failure to file a responsive pleading that resulted in the entry of default, the problem could have been cured by permitting Garcin to try the issue of causation. Unfortunately, the trial court precluded evidence and argument on that issue, conducting a trial on damages only and omitting the trial within the trial of the underlying action. Accordingly, the issue of causation was never determined and the judgment must be reversed. (*Lysick* v. *Walcom, supra,* 258 Cal.App.2d at p. 153.)

### DISPOSITION

The judgment is reversed and remanded with directions to the trial court (1) to vacate the judgment in its entirety and (2) to vacate that portion of the order summarily adjudicating issues insofar as issue No. 3 is concerned. The first two issues were undisputed and were not challenged on appeal and shall therefore stand as summarily adjudicated. Appellants Robert W. Garcin and Irsfeld, Irsfeld & Younger are to recover their costs on appeal.

Ortega, J., concurred.

SPENCER, P. J.—I concur in the result. However, in my view, the question of causation is encompassed within United Community Church's undisputed fact No. 12. Defendants understood fact No. 12 in this fashion, and the issue of causation was fully briefed in the pleadings on the motion. Additionally, I do not view any evidentiary defect in United Community Church's statement of undisputed facts as fatal to the motion. Hence, I would reach the question

of whether defendants successfully demonstrated the existence of a triable issue of material fact as to causation.

To be sure, fact No. 12 expresses an ultimate fact rather than a detailed evidentiary fact: *Because* defendants failed to file an answer, United Community Church (UCC) *lost* the case and was injured by the resulting judgment. However, implicit in the statement that defendants' nonfeasance caused UCC to lose the underlying case is the assertion no other circumstance, such as the lack of a meritorious defense, contributed to the loss. In other words, fact No. 12, if true, would require or permit the ruling UCC desired.

That fact No. 12 adequately informed defendants of UCC's causal claim is evident in their response to it. Defendants disputed the fact and presented evidence which, they asserted, demonstrated UCC would not have prevailed in the underlying action had Garcin timely filed an answer. Clearly, defendants were aware of what evidence was required to dispute fact No. 12. Judgment against UCC was secured in the underlying action on the theory UCC and all other underlying corporate defendants had an alter ego relationship with McBirnie and thus no separate corporate identities. Defendants knew this and consequently realized that to prove causation, UCC must establish it did not have an alter ego relationship with the other underlying defendants. Thus, the due process aspect of the separate statement requirement was satisfied.

Moreover, that fact No. 12 is not sufficiently "evidentiary" in form, and UCC's separate statement of undisputed facts thus does not include the "evidentiary" fact is not a fatal defect. As the majority acknowledges, the failure to comply with the requirement of providing a separate statement of all material facts the moving party contends are undisputed—as opposed to the failure to present *evidence* establishing or negating essential material facts—confers on the trial court the discretion to deny the motion on this ground. Denial is not mandatory. (Code Civ. Proc., § 437c, subd. (b).) Whatever the prevailing view may be on when the trial court appropriately overlooks the failure to comply, the fact remains that the matter is one of discretion. Where, as here, the opposing party is not misled or confused and all essential material, clearly identified, is before the court, it is hardly an abuse of discretion for the trial court to eschew this ground for denial of the motion. So long as the essential evidentiary framework is present, the court is entirely within its rights in granting the motion. (*Id.,* subd. (c).)

That UCC had failed to include such evidence in its initial moving papers did not automatically entitle defendants to denial of the motion under all circumstances. Contrary to the majority's assertion, the opportunity to present evidence in support of the motion was not then closed to UCC.

In *Weiss* v. *Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094 [251 Cal.Rptr. 727], the plaintiff was suing on a theory of vicarious liability. When the defendant moved for summary judgment, it argued the plaintiff had no evidence of a principal-agent relationship and no knowledge of the existence of such evidence. (At p. 1098.) The plaintiff opposed the motion, arguing the defendant had the burden of negating such a relationship. The defendant then submitted a reply which incorporated the declaration of a management employee and sales and lease contracts between the defendant and the purported agent. From this evidence, the trial court found there was no agency relationship and granted summary judgment. (*Ibid.*)

On appeal, the plaintiff argued the court was precluded from considering the evidence since it did not accompany the original moving papers. The appellate court found no error. (*Weiss* v. *Chevron, U.S.A., Inc., supra,* 204 Cal.App.3d at p. 1098.) "Code of Civil Procedure section 437c, subdivision (b), permits the filing of '[a]ny reply to the opposition . . .' and does not expressly or impliedly prohibit the inclusion of evidentiary matter with the reply. Moreover, subdivision (c) states that the motion 'shall be granted *if all the papers submitted* show that there is no triable issue . . . ,' and the court 'shall consider *all of the evidence set forth in the papers*' except that to which objections have been sustained. (Italics added.) This unqualified reference to 'the papers' before the court, without limitation to documents submitted with the original motion, also supports the reasonable inference that the court should consider all admissible evidence of which the opposing party has had notice and the opportunity to respond. [Citation.]

"The conclusion is consistent with the general rule that 'a trial court has inherent power, independent of statute, to exercise its discretion and control over all proceedings relating to the litigation before it [citation]. One phase of such power . . . is the power to obtain evidence upon which the judgment of the court may rest [citation]. . . . [Thus], in summary judgment proceedings, the trial court is vested with discretion to permit the filing of affidavits in addition to those specifically mentioned in the statute and its determination in this respect will not be disturbed on appeal unless an abuse of discretion is clearly shown.' [Citation.]" (*Weiss* v. *Chevron, U.S.A., Inc., supra,* 204 Cal.App.3d at pp. 1098-1099.)

It is indeed true defendants would have been entitled to a denial of the instant motion had they submitted no opposition at all. However, as *Weiss* makes clear, once they noted the defect and engaged the issue, UCC had a revived opportunity to present evidence in proof of causation, i.e., that it had a complete defense to the underlying action.

Where, as here, the parties have engaged the critical issue fully, briefed it comprehensively and presented the evidence at their disposal, the reversal of

the judgment on the basis of the perceived procedural defect that fact No. 12 is not sufficiently "evidentiary" raises a spectre of potentially wasted judicial resources. UCC has presented evidence it does not have an alter ego relationship with the other defendants in the underlying action and thus, inferentially, that it had a complete defense to that action. This proves the element of causation. It demonstrates that but for Garcin's negligence, UCC would have defended the underlying action successfully. (*Sukoff* v. *Lemkin* (1988) 202 Cal.App.3d 740, 744 [249 Cal.Rptr. 42].) If the evidence defendants submitted is not adequate to raise a triable issue as to whether UCC did indeed have an alter ego relationship with the other defendants in the underlying action, then reversal would needlessly require a trial of this issue. The trial courts are too crowded and too overworked for this court to countenance such an exercise in futility. To me, this is the overriding consideration. Consequently, I turn my attention to the question of whether defendants demonstrated the existence of a triable issue of fact.

The doctrine of alter ego comes into play when a plaintiff claims a defendant "is using the corporate form unjustly and in derogation of the plaintiff's interests." (*Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 300 [216 Cal.Rptr. 443, 702 P.2d 601].) The doctrine operates to prevent individuals from using a corporate entity merely as a shield from liability for bad faith or fraudulent actions. (*Clark* v. *Millsap* (1926) 197 Cal. 765, 781-782 [242 P. 918].) As noted in *Associated Vendors, Inc.* v. *Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838 [26 Cal.Rptr. 806], "while the doctrine does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished. Accordingly, bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity. [Citations.]"

To establish the corporate entity is indeed an alter ego, there must be "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist" and, "if the acts are treated as those of the corporation alone, an inequitable result will follow." (*Automotriz etc. De California* v. *Resnick* (1957) 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042]; accord, *Mesler* v. *Bragg Management Co.*, *supra*, 39 Cal.3d at p. 300.) The bad faith or inequitable conduct justifying the invocation of the doctrine must be that of the party against whom it is invoked. That party must have played a part in a course of conduct which constitutes an abuse of the corporate privilege or must be seeking an inequitable advantage from the "fiction" of a separate corporate existence. (*United States Fire Ins. Co.* v. *National Union Fire Ins. Co.* (1980) 107 Cal.App.3d 456, 472 [165 Cal.Rptr.

726].) The same principles apply where the entity sought to be held liable is another corporation rather than an individual. (*Mesler, supra*, at p. 300.)

Generally, the result will depend on the circumstances of a particular case; there is no litmus test for determining the issue. (*Mesler* v. *Bragg Management Co., supra*, 39 Cal.3d at p. 300.) "The essence of the alter ego doctrine is that justice be done. . . . Thus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." (*Id.* at p. 301.) Consequently, the question generally is one of fact. (*Jack Farenbaugh & Son* v. *Belmont Construction, Inc.* (1987) 194 Cal.App.3d 1023, 1032-1033 [240 Cal.Rptr. 78]; *Associated Vendors, Inc.* v. *Oakland Meat Co., supra*, 210 Cal.App.2d at pp. 836-837.)

All cases in which the courts have found the existence of an alter ego relationship involve such elements as the commingling of funds and other assets, the failure to separate the assets of separate entities, the treatment of the corporation's assets as those of an individual or other corporation, holding out that the individual or other corporation is personally liable for the first corporation's debts, the failure to maintain separate records or the commingling of the records of the entities, identical equitable ownership in the two entities, the equitable owners' domination and control of the entities, the use of the same business location, an identity of employees or attorneys in separate entities, the use of the corporation as a mere shell or instrumentality for the conduct of the affairs of another entity, the failure to maintain arm's length transactions between entities and the diversion of assets. (*Associated Vendors, Inc.* v. *Oakland Meat Co., supra*, 210 Cal.App.2d at pp. 838-840; see also *Roman Catholic Archbishop* v. *Superior Court* (1971) 15 Cal.App.3d 405, 411 [93 Cal.Rptr. 338].) In every case, several of these factors are present. (*Associated Vendors, Inc., supra*, 210 Cal.App.2d at p. 840.)

In support of its position it did not have an alter ego relationship with the other underlying corporate defendants and McBirnie, UCC submitted the declaration of Ron L. Hubbard (Hubbard), in which he states he had worked as a minister on UCC's staff from May 1975 through June 1982. From 1978 to June 1979, he also was employed part time by Community Churches of America, one of the other underlying corporate defendants. He had a close association with the president and faculty of the California Graduate School of Theology and with the director and staff of Voice of Americanism. Hubbard had a very close relationship with the management of the Concord Senior Housing Foundation. All of these organizations were run solely by McBirnie. Hubbard was familiar with the day-to-day workings, operations and financial dealings of these organizations.

According to Hubbard, there never was any commingling of funds between UCC and the other organizations. UCC had an autonomous congregation. Its governing body was the board of deacons, elected by its membership and completely responsible thereto for its decisions. McBirnie was only a pastor/employee of UCC; he was not authorized to act without the consent of the board or membership. On occasions, McBirnie requested that the board take certain actions but his requests were denied. All of the other underlying defendants were controlled by McBirnie; they had no organizational meeting minutes, and their funds were commingled. In contrast, the ownership of UCC was vested in the church members. Members of the board of deacons were not associated with and did not deal with any of the other underlying corporate defendants.

As of the spring of 1977, UCC operated out of a building separate from the headquarters of the other organizations. While there were sales of property between plaintiff and the other organizations, each sale was conducted as an arm's length transaction. UCC never received or had diverted to it any assets from the other underlying corporate defendants.

It is against the backdrop of this evidence that defendants attempted to demonstrate there was a triable issue of material fact as to whether an alter ego relationship existed. Among the evidence defendants submitted was a declaration executed in the underlying action by the attorney for the underlying plaintiffs, Christ Troupis. UCC objected to this declaration on the ground it was hearsay in its entirety. The objection was not well taken.

An affidavit is any written declaration under oath or under penalty of perjury made without notice to the opposition. (Code Civ. Proc., §§ 2003, 2015.5.) Generally, an affidavit may be used "upon a motion, and in any other case expressly permitted by statute." (Code Civ. Proc., § 2009.) Code of Civil Procedure section 437c, subdivision (b), expressly provides for the use of affidavits or declarations in support of and opposition to a motion for summary judgment or summary adjudication of issues (Code Civ. Proc., § 437c, subd. (f)). Nothing in the statute requires that an affidavit be created specifically for this purpose.

In the absence of statutory authorization for use, an affidavit is hearsay. (*Estate of Fraysher* (1956) 47 Cal.2d 131, 135 [301 P.2d 848].) However, statutory authorization for the use of affidavits creates an exception to the hearsay rule and renders affidavits admissible evidence. (See *People* v. *Dickinson* (1976) 59 Cal.App.3d 314, 319 [130 Cal.Rptr. 561]; *Moon* v. *Moon* (1944) 62 Cal.App.2d 185, 188 [144 P.2d 596].) Accordingly, the Troupis declaration was admissible and remained available for the trial court's consideration in determining plaintiff's motion.

The Troupis declaration contains the following pertinent facts: A December 31, 1980, balance sheet of Community Churches of America incorporates real property assets including a parcel located in Forest Springs, California, which supposedly was the property of UCC. The balance sheet also includes the liabilities of UCC's World Emergency Relief organization. In preparing the balance sheet, Community Churches of America made no effort to separate its assets from those of other organizations. A copy of the balance sheet is attached to the declaration.

Community Churches of America purchased 5,000 Bibles to be used to raise funds for the California Graduate School of Theology and plaintiff. These were to be distributed to those making contributions solicited through Voice of Americanism broadcasts. The Bibles were imprinted with the names of UCC and the California Graduate School of Theology. While the Hubbard declaration states the Bibles were purchased without the consent of UCC's board of deacons, and Community Churches of America was reimbursed for the cost of the Bibles, this simply creates a factual conflict which, for the purposes of summary judgment, must be resolved in defendants' favor. (*Zeilman* v. *County of Kern* (1985) 168 Cal.App.3d 1174, 1178 [214 Cal.Rptr. 746].)

Defendants also submitted the testimony Hubbard gave in the default prove-up hearing, in which he stated he worked for McBirnie both as a pastor and pastor-administrator of plaintiff and in estate planning for Community Churches of America. Hubbard further testified it was his understanding "*these organizations,*" previously listed to include UCC, provided McBirnie with an automobile and an expense account. In addition, defendants submitted articles of incorporation showing that upon dissolution the assets of the California Graduate School of Theology, Community Churches of America, United Community Churches of America, Inc., and the Center for American Studies all would go to UCC unless it too had ceased to exist.

The evidence submitted on the question of the existence of an alter ego relationship thus at a minimum raises questions of fact as to several of the factors pertinent to the inquiry. With respect to the commingling of funds and assets, the failure to segregate assets of various entities, the treatment of one entity's assets as those of another entity and holding out that one entity is liable for the other entity's debts, there are two pertinent facts: First, at least one of what appears to be UCC's real property assets and those of its liabilities related to World Emergency Relief are commingled with those of Community Churches of America on the latter's December 31, 1980, balance sheet. Second, Community Churches of America purchased Bibles to be distributed in part to raise funds for UCC.

There is a certain identity of employees among the various organizations. Both Community Churches of America and UCC employed McBirnie and Hubbard. While evidence a defendant is a managing employee of a corporation is insufficient in itself to establish that defendant has an alter ego relationship, i.e., *is* a/the person for whom the corporation is an alter ego (*Riddle* v. *Leuschner* (1959) 51 Cal.2d 574, 580 [335 P.2d 107]), an *identity* of employees among two organizations remains highly relevant to the inquiry (*Roman Catholic Archbishop* v. *Superior Court, supra,* 15 Cal.App.3d at p. 411; *Associated Vendors, Inc.* v. *Oakland Meat Co., supra,* 210 Cal.App.2d at p. 839). Finally, with respect to the use of one corporation as a mere shell or instrumentality for the conduct of the affairs of another entity, there is some suggestion of this in all of the foregoing evidence, as well as in the disposition of the other entities' assets upon dissolution for the benefit of UCC.

In other words, there is at least some evidence tending to show the presence of six of the factors identified in *Associated Vendors, Inc.* v. *Oakland Meat Co., supra,* 210 Cal.App.2d at pages 838-840. This is sufficient evidence to have raised a triable issue of material fact on the question of alter ego and thus to require reversal of the judgment for the prejudice attending the trial court's erroneous failure to permit defendants to try this issue. Moreover, there is another basis upon which the same conclusion must be reached.

In opposing the motion for summary judgment, defendants submitted a declaration informing the trial court they expected to have additional evidence on the question of alter ego in the form of the deposition testimony of one Eloise Mulder, the treasurer of UCC from 1967 through 1987. As Dan Longo, defendants' counsel declared, "[t]he deposition was conducted on May 22, 1989 in Alexandria, Louisiana and declarant expects to receive a transcript of that deposition on or about June 3, 1989. Immediately upon receipt, declarant will lodge the applicable portions of that deposition testimony with the court as it pertains to this motion."

In the interim, Attorney Longo summarized the contents of that testimony which he considered pertinent. In short, he represented Mrs. Mulder had testified McBirnie actively controlled UCC during the years Mrs. Mulder served on the board, and members "invested" funds with UCC which then were funneled to Community Churches of America at a profit to UCC. In addition, she testified to numerous real property transactions between UCC and the other entities, some of which involved the cancellation of promissory notes those entities had signed in favor of UCC's members. Attorney Longo also represented that McBirnie's deposition had yet to be taken and he expected it to yield further evidence the other entities were the alter egos of

UCC. On the basis of this declaration, defendants requested a continuance of the hearing on the motion should the deposition transcripts prove unavailable at the time of the hearing. The transcripts were indeed unavailable at the time of the hearing; although the McBirnie deposition had begun, it was not completed.

Thus, by affidavit, defendants provided a sound basis for concluding "facts essential to justify opposition may exist but cannot, for reasons stated, then be presented." (Code Civ. Proc., § 437c, subd. (h).) This required the court to grant a continuance or deny the motion. (*Ibid.*; *American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1280 [241 Cal.Rptr. 466]; *Nazar v. Rodeffer* (1986) 184 Cal.App.3d 546, 556 [229 Cal.Rptr. 209].)

To be sure, the declaration of UCC's attorney, Harry Scolinos, characterizes the Mulder deposition testimony differently as it concerns McBirnie's involvement in UCC's operation and the nature of the "investment" and real property transactions. In addition, it states the first portion of McBirnie's deposition, then concluded, establishes UCC had no alter ego relationship with the other entities. However, the fact remains these deposition transcripts were unavailable at the time of the hearing; the McBirnie deposition was not even completed. There is no reason to accept at face value Attorney Scolinos's characterization of the deposition testimony while rejecting Attorney Longo's characterization. Moreover, it is clear the trial court did not do so. Rather, as the majority notes, the court expressed the erroneous view defendants were foreclosed from attempting to raise a triable issue of fact as to UCC's alter ego relationship with the other underlying corporate defendants. Hence, had it not been for the trial court's erroneous ruling on causation, it is clear defendants were entitled to a continuance of the hearing on the motion.

It is equally clear the error was prejudicial. If the deposition testimony is as defendants represent it to be, then it adds weight to those factors suggesting the existence of an alter ego relationship of which there already is evidence and provides support for additional factors. Most importantly, the Mulder deposition testimony would provide evidence of the diversion of assets from one entity to another and a failure to maintain arm's length transactions between the entities. Even if the six factors already supported by some evidence were not enough to create a triable question of fact, the evidence supporting these two additional factors assuredly would be adequate when added to that already presented. There is more than a suspicion here that these entities, including UCC, have "such unity of interest and ownership that the separate personalities of the corporation and the individ-

ual no longer exist" (*Automotriz etc. De California* v. *Resnick, supra,* 47 Cal.2d at p. 796); there is a genuine question which requires a full trial.

Of the second requirement, that an inequitable result will follow if the acts are treated as those of the corporation alone (*Automotriz etc. De California* v. *Resnick, supra,* 47 Cal.2d at p. 796), there also is at least some evidence. The listing of UCC's assets and liabilities on the Community Churches of America balance sheet and the indications of the "investment" funneling and real property transactions purportedly to be found in the Mulder deposition testimony clearly suggest UCC played a part in a course of conduct which constitutes an abuse of the corporate privilege (*United States Fire Ins. Co.* v. *National Union Fire Ins. Co., supra,* 107 Cal.App.3d at p. 472). Accordingly, I would reverse the judgment on the ground that defendants did indeed demonstrate the existence of a triable issue of material fact, and the trial court's refusal to permit them to try this issue thus was prejudicial.